UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCH SPECIALTY INSURANCE
COMPANY,

                    Plaintiff,

v.

TDL RESTORATION, INC.,

                    Defendant.

No. 18-CV-6712 (KMK)

ORDER

KENNETH M. KARAS, United States District Judge:

I.  Background

In support of its pending Motion for Summary Judgment, (Dkt. No. 52), Plaintiff Arch Specialty Insurance Company ("Plaintiff" or "Arch") has filed, *inter alia*: (i) a copy of Commercial General Liability Policy No. AGL 003546500 (the "Policy") issued to Defendant TDL Restoration, Inc. ("Defendant" or "TDL"), (*see generally* Decl. of Sal A. Pellitteri ("Pellitteri Decl.") Ex. A (Dkt. Nos. 55-3, 55-4)); (ii) a copy of the audit that produced the "Additional Premium" (as defined in ¶ 12 of the Pellitteri Declaration) at issue in this case (the "Audit Report"), (*see* Pellitteri Decl. Ex. B (Dkt. No. 55-5)); and (iii) a copy of the "Audit Endorsement" showing the results of the audit and the individual adjustments that produced the Additional Premium, (*see* Pellitteri Decl. Ex. C (Dkt. No. 55-6)).  Plaintiff argues that in submitting these documents, along with the declaration of Sal. A. Pellitteri, who is responsible for the collection of debts owed to Arch, it "has met its burden and is entitled to summary judgment on its first cause of action, breach of contract."  (Pl.'s Mem. of Law in Supp. of Mot. For Summ. J. ("Pl.'s Mem.") 6 (Dkt. No. 53).)

II.  Discussion

As Plaintiff notes, (*see id.* at 5), "[a]n insurer establishes a prima facie case of liability for insurance premiums on an audited policy by offering evidence: (1) showing that the policy was issued to the insured; and (2) illustrating the computation of the earned premium established through an audit of the insured's books and records after the expiration of the policy period[,]" *Liberty Mut. Ins. Co. v. Thalle Constr. Co., Inc.*, 116 F. Supp. 2d 495, 500 (S.D.N.Y. 2000); *see also, e.g.*, *Wausau Bus. Ins. Co. v. Sentosa Care LLC*, 10 F. Supp. 3d 444, 457 (S.D.N.Y. 2014) (same).  It is also true, however, that a plaintiff does not carry its burden on a motion for summary judgment "by simply dumping documents as exhibits to [its] motion." *Travelers Ins. Co. v. Sequa Corp.*, No. 08-CV-10400, 2013 WL 12342419, at *5 (S.D.N.Y. Feb. 22, 2013), *vacated in part on other grounds on reconsideration*, 2014 WL 12812403 (S.D.N.Y. Mar. 10, 2014).  In *Travelers*, the plaintiffs submitted documents in support of their summary judgment motion similar to those submitted here.  *See Travelers*, 2013 WL 12342419, at *4 (noting that the plaintiffs' submissions included affidavits from a senior case manager familiar with the defendant's account, a copy of the relevant agreements, and certain valuations that gave rise to the dispute).  But as the court there explained, "[i]t is entirely unclear to those who are not seasoned insurance professionals how th[e] numbers were applied to or derived from the [plaintiffs'] formula [used] to determine premium amounts." *Id.*  "Unfortunately," the court continued,

> [the case manager's] affidavits do not provide further assistance in deciphering the valuations.  The affidavits simply reference the amount due, citing the valuation for the year at issue as if it were plainly self-explanatory.  [The] [p]laintiffs do not point to any specific pages in their materials, . . . and do not explain the genesis of the numbers they assert.  Had [p]laintiffs simply provided more meaningful statements from the affiant giving instruction on how to understand the documents they generated, confirming the premium calculations on summary judgment may have been much less time-consuming and much more successful for the [c]ourt.

2

*Id.* at *5.  Denying the motion for summary judgment, the court observed that without "some guidance from [the] [p]laintiffs, the task of . . . trying to piece together numbers that relate to the premium payment formula has proven to be insurmountable[,]" and because "[p]laintiffs have provided no help, they have not shown the proper calculations of the premiums established through an audit of the insured's records, entitling them to judgment as a matter of law." *Id.*

Similarly, in *Federal Insurance Co. v. Elf Aquitaine, Inc.*, 511 F. Supp. 2d 390 (S.D.N.Y. 2007), the plaintiff "made no attempt to explain how . . . 90 odd pages of insurance claims and retrospective computations [submitted in support of its summary judgment motion] [were] connected[,]" leaving the court to make sense of these submissions on its own, *id.* at 396. Although the plaintiff in *Federal Insurance* asserted that it had provided all its calculations to the court, it "never explain[ed] how any of the numbers in Exhibit 3 derive from the figures in Exhibit 4, or how Exhibit 4's figures supposedly arise from the numbers in Exhibit 5."  *Id.* Although the court "tried to tick and tie the numbers itself, . . . without even a jot of guidance from [the plaintiff], the task [proved] time consuming and, ultimately, impossible."  *Id.* Accordingly, the court denied summary judgment.  *Id.*; *cf. Wasau*, 10 F. Supp. 3d at 458 (granting the plaintiff's motion for summary judgment where the plaintiff had provided "the description and methodology for calculating the premiums and other costs" in two declarations that "clearly and convincingly show[ed] each calculation").

Although the documentation Arch has submitted in support of its motion is not as voluminous as that submitted in *Travelers* or *Federal Insurance*, the Court has found it equally inscrutable.  The Court has carefully examined the Policy, the Audit Report, and the Audit Endorsement in an effort to discern precisely how the Additional Premium was calculated.  The Court recognizes, for example, that the figures in the "Premium" column on pages six through

3

nine of the Audit Endorsement, when added together, equal the Additional Premium.  (*See* Pellitteri Decl. Ex. C, at 6–9.)[1]  It recognizes that at least some of the figures in the "Rate" column on pages six and seven of the Audit Endorsement—specifically, $430.754, $48.566, $566.487, and $30.911—appear to come from page six of the Policy.  (*Compare* Pellitteri Decl. Ex. C, at 6–7, *with* Pellitteri Decl. Ex. A, at 6.)  But the origin of the remaining "Rate" figures—$28.000, $58.770, $15.997, $57.007, $9,839, and $8.000—is unclear.  (*See* Pellitteri Decl. Ex. C, at 7–9.)  Similarly, although the Court can trace the $37,128 "Audit Exposure" figure on pages six and seven of the Audit Endorsement to the same figure on pages six and nine of the Audit Report, (*compare* Pellitteri Decl. Ex C, at 6–7, *with* Pellitteri Decl. Ex. B, at 6, 9), it has not identified the provenance of the $404,752 "Audit Exposure" figure on page six of the Audit Endorsement, (*see* Pellitteri Decl. Ex. C, at 6).  Even if the Court could determine where each figure in the Audit Endorsement came from, it is still unclear how the final "Premium" figures on pages six through nine of the Audit Endorsement were calculated.  The Court has reviewed the Policy and Audit Report but has not identified a formula or function that explains Plaintiff's calculations.  Similarly, although Plaintiff has written that "the [A]udit [R]eport explains the basis for the Additional Premium[,]" (Pl.'s Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Pl.'s Reply") 4 n.5 (Dkt. No. 65)), that is true only in the narrowest sense.  While the "Comments" section on pages nine through 11 of the Audit Report contain short sentences corresponding to different variances uncovered in the audit, (*see, e.g.*, Pellitteri Decl. Ex. B, at 9 ("The variances in class codes 91342 and 97447 for NY are due to understatement of

---

[1] Unless otherwise noted, page references for exhibits refer to the ECF stamp at the top of the page.

estimates.")), these cryptic notations do not aid the Court in understanding how these variances impact the calculation of the Additional Premium.

Although the Court reserves decision on whether to grant or deny Plaintiff's Motion, Plaintiff has one week to provide the Court with a supplemental affidavit explaining *precisely* how the Additional Premium was calculated.  The affidavit should be clear, methodical, and painstaking in its explanation, and it should walk the Court through Plaintiff's calculation with reference to the exhibits Plaintiff already submitted in support of its Motion—namely, the Policy, the Audit Report, and the Audit Endorsement.  Plaintiff should also provide documentation and explanation regarding its calculation of $6,476.61 in state taxes and fees, which was based on its calculation of the Additional Premium.  (*See* Pl.'s Mem. 3.)

Following Plaintiff's submission of its supplemental affidavit, Defendant may submit a reply addressing any aspect(s) of Plaintiff's affidavit.

### III.  Conclusion

Accordingly, it is hereby ORDERED that Plaintiff shall submit a supplemental affidavit as described above no later than January 20, 2021.  Defendant may file a reply no later than January 27, 2021.

SO ORDERED.

Dated:   January 12, 2021
        White Plains, New York

                                                            KENNETH M. KARAS
                                                          United States District Judge