UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARCH SPECIALTY INSURANCE
COMPANY,

                              Plaintiff,

        v.

TDL RESTORATION, INC.,

                              Defendant.

No. 18-CV-6712 (KMK)

OPINION & ORDER

Appearances

J. Gregory Lahr, Esq.
Cara C. Vecchione, Esq.
Robinson & Cole LLP
New York, NY
*Counsel for Plaintiff*

Hugh G. Jasne, Esq.
Jasne & Florio
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Arch Specialty Insurance Company ("Arch" or "Plaintiff") brings this Action against

TDL Restoration, Inc. ("TDL" or "Defendant"), asserting claims for breach of contract, unjust

enrichment, and account stated.  (*See* Compl. ¶¶ 5–17, 18–21, 22–25 (Dkt. No. 1).)  Currently

before the Court is Plaintiff's Motion for Summary Judgment on its breach of contract and

account stated claims.  (*See* Not. of Mot. (Dkt. No. 52).)  For the reasons discussed below, the

Motion is granted in part and denied in part.

I.  Background

A.  Factual History

Unless otherwise noted, the following facts are taken from the Parties' Rule 56.1 Statements and Counterstatements.  (*See* Pl.'s 56.1 Statement in Supp. of Pl.'s Mot. ("Pl.'s 56.1") (Dkt. No. 54); Def.'s Counter 56.1 Statement in Opp'n to Pl.'s 56.1 ("Def.'s Counter 56.1") (Dkt. No. 59-4).)[1]  The facts as described below are not in dispute except to the extent indicated.

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).  Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to

1.  The Arch Policy and Audit

Plaintiff issued an insurance policy that provided Defendant with commercial general liability coverage from March 28, 2016 to March 28, 2017 (the "Arch Policy" or the "Policy"). (Pl.'s 56.1 ¶¶ 3–4.)  Under the Policy, Plaintiff agreed to provide this coverage in exchange for Defendant's payment of policy premiums.  (*Id.*)  Defendant's initial premium payment (the "Initial Premium") was based on its estimated exposure during the effective dates of coverage. (*Id.* ¶¶ 6–7.)[2]  But because the Initial Premium was based on estimated exposure, the Policy was also "subject to audit based on the actual exposure during the effective dates of coverage."  (*Id.* ¶ 7.)  Depending on the results of the audit, Defendant would either owe additional premium to Plaintiff, or Plaintiff would owe a return of premium to Defendant.  (*Id.*)

It is undisputed that Plaintiff fulfilled its obligations under the Policy and provided insurance coverage to Defendant during the effective dates of coverage.  (Def.'s Counter 56.1 ¶ 5.)  After the coverage period had ended, and consistent with the terms of the Policy, an audit was performed on or about May 16, 2017.  (*Id.* ¶ 10.)  The audit found that Defendant owed Plaintiff $171,339.00 in additional premium (the "Additional Premium").  (*Id.* ¶ 11.)  Although

---

search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact" (alteration and quotation marks omitted)).  Therefore, where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

[2] Plaintiff avers that "the initial premium was based on information submitted by [Defendant] and/or its insurance agent/broker on behalf of [Defendant] regarding [Defendant's] estimated exposure for the effective dates of coverage."  (Pl.'s 56.1 ¶ 6.)  Although Defendant asserts that it "cannot state from where the Plaintiff obtained the information for the premium," (Def.'s Counter 56.1 ¶ 6), it nevertheless concedes that "the initial premium was based on estimated exposure," (*id.* ¶ 7).  For purposes of resolving the instant Motion, it is immaterial who provided the information on which the Initial Premium was based.

Defendant acknowledges this was the result of the audit, it has not conceded "the accuracy of the underlying determination."  (*Id.*)[3]  Pursuant to the Policy, Plaintiff sent Defendant an invoice for the Additional Premium on June 6, 2017.  (*See* Pl.'s 56.1 ¶ 12; Def.'s Counter 56.1 ¶ 12; *see also* Decl. of J. Gregory Lahr, Esq., in Supp. of Pl.'s Mot. for Summ. J. ("First Lahr Decl.") Ex. 3 ("Pellitteri Decl.") Ex. D ("June 2017 Invoice") (Dkt. Nos. 55, 55-3, 55-7).)

Plaintiff also asserts that "as a result of the Additional Premium[,]" Defendant owes an additional $6,476.61 in New York state taxes and fees (the "Taxes and Fees"), which consists of a New York Surplus Lines Tax and a New York State Stamping Fee.  (Pl.'s 56.1 ¶¶ 15–16.)  Thus, between the Additional Premium ($171,339.00) and Taxes and Fees ($6,476.61), Plaintiff alleges that Defendant owes a total balance of $177,815.61.  (*See* Pl.'s 56.1 ¶ 19; Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 4 (Dkt. No. 53).)

According to Plaintiff, "[o]n numerous occasions prior to the commencement of this [A]ction, [it] demanded payment of the Additional Premium and . . . Taxes and Fees."  (Pl.'s 56.1 ¶ 18.)  Though Defendant concedes that Plaintiff invoiced Defendant for the Additional Premium, (*see* Def.'s Counter 56.1 ¶ 12), it denies that Plaintiff demanded payment "[o]n numerous occasions[,]" arguing that Plaintiff "failed to provide any proof of . . . when the demands for payment were purportedly made[,]" (*id.* ¶ 18).  Finally, Plaintiff asserts that Defendant has "failed and refused to remit payment" of both the Additional Premium and the Taxes and Fees.  (Pl.'s 56.1 ¶¶ 14, 17.)

---

[3] Although Defendant is controlled by a president and sole shareholder, Mr. Driton ("Danny") Quni, the Court refers to Defendant using the neuter pronoun "it" because it is a corporate entity.  (*See* Aff'n of Hugh G. Jasne, Esq., in Opp'n to Summ. J. ("Jasne Aff'n") Ex. C ("Quni Aff.") ¶ 1 (Dkt. Nos. 59, 59-3).)

<u>2.  Defendant's Discovery of Purported Payment Records</u>

After the close of discovery, Plaintiff brought the instant Motion for Summary Judgment. In opposing the Motion, Defendant declared a remarkable discovery: it had "recently located a document which appear[ed] to represent full payment of the audit premiums at issue in this [A]ction."  (Def.'s Mem. of Law in Opp'n to Summ. J. ("Def.'s Opp'n") 1 (Dkt. No. 59-5).)[4] The document (the "Alleged Payment Record"), which Defendant's lawyer described as a "printout" from a software accounting program, contains 21 rows of data and 10 columns with designations such as "Transaction," "Amount," "Balance," and "Invoice #."  (*See* Jasne Aff'n ¶ 6; Jasne Aff'n Ex. B (Dkt. No. 59-2).)  The penultimate row of data contains the notation "co coing direct for audit" and states an amount of "-171339.00," which is the same amount as the Additional Premium.  (*See* Jasne Aff'n Ex. B.)  The final row of data contains the notation "Company fee" and states an amount of "-6476.61," which is the amount of the Taxes and Fees. (*See id.*)  Defendant's lawyer attached the document to an affirmation and submitted that it was a "true and accurate record from the Plaintiff's records evidencing payment of the Audit Premium."  (Jasne Aff'n ¶ 8.)[5]  Defendant characterized this document as a "smoking gun" that

---

[4] Explaining the circumstances behind this eleventh-hour discovery, Defendant's president and sole shareholder stated in an accompanying affidavit that although "[his] record keeping is not the best[,] . . . the more [he] thought about the situation the more certain [he] became that [he] had paid [the Additional Premium], and thus [he] kept searching records whenever [he] had the opportunity."  (*See* Quni Aff. ¶ 15.)

[5] Defendant's lawyer uses the capitalized term "Audit Premium" without defining that term.  (*See generally* Jasne Aff'n.)  That is, he does not clarify whether "Audit Premium" refers solely to the Additional Premium, or whether it refers to both the Additional Premium *and* the additional Taxes and Fees.  The same ambiguity is replicated in the affidavit of Defendant's president.  (*See* Quni Aff. ¶ 14 (referring, without definition, to the "Audit Premium").)  However, because the Alleged Payment Record contains numeric entries that correspond to both the Additional Premium ($171,339.00) and the Taxes and Fees ($6,476.61), (*see* Jasne Aff'n Ex. B), the Court interprets Defendant's assertion as a claim that he paid *both* the Additional Premium *and* the Taxes and Fees.

should not only defeat the instant Motion, but should also prompt "dismissal of th[is] [A]ction in [its] entirety." (Def.'s Opp'n 1.) In addition to this alleged "smoking gun" document, Defendant also submitted a second, highly similar document that its lawyer described as an "invoice from Plaintiff showing the [Additional] Premium to have been paid as of June 23, 2017" (the "Alleged Invoice"). (Jasne Aff'n ¶ 6; Jasne Aff'n Ex. A (Dkt. No. 59-1).) Like the Alleged Payment Record, the Alleged Invoice contained 21 rows of data, the penultimate of which states an amount of "-171339.00" with the notation "co coing direct for audit." (Jasne Aff'n Ex. A.) The final row states an amount of "-6476.61" with the notation "Company fee." (*See id.*) At the top of the document is a banner containing the words "Customer Transaction History" and a date of January 31, 2020. (*See id.*) Relying on these newly discovered documents, Defendant denied Plaintiff's assertion that it had failed to pay the Additional Premium, (*see* Def.'s Counter 56.1 ¶ 14), denied that it had failed to pay the additional Taxes and Fees, (*see id.* ¶ 17), and therefore denied that Plaintiff has suffered any damages, (*see id.* ¶ 19).

In light of these newly discovered documents, Plaintiff, with Defendant's consent, requested a 30-day adjournment of its reply deadline so the Parties could seek additional discovery regarding the Alleged Invoice that had been produced. (*See* Letter from J. Gregory Lahr, Esq., to Court (June 25, 2020) ("June 25 Lahr Letter") 1 (Dkt. No. 60).) As Plaintiff's lawyer explained, Defendant had "failed to produce [this document] in discovery and its origin [was] unclear." (*Id.*) The Court granted the request. (*See* Dkt. No. 61.)

During this supplemental discovery period, it emerged that Plaintiff had in fact received the Alleged Invoice and Alleged Payment Record from Rosenzweig Insurance Agency ("Rosenzweig Insurance"), which served as Defendant's insurance broker. (*See* Decl. of J. Gregory Lahr, Esq., in Further Supp. of Pl.'s Mot. for Summ. J. ("Second Lahr Decl.") Ex. A

(Def.'s Resps. to Pl.'s First Set of Reqs. for Admis. ("Def.'s Resps.")) ¶¶ 8, 14 (Dkt. Nos. 64, 64-1); Second Lahr Decl. Ex. D ("Rosenzweig Decl.") ¶ 3 (Dkt. No. 64-4).)   The Alleged Payment Record that Defendant produced as its "smoking gun" was, in fact, "a screenshot of Rosenzweig Insurance's ledger report for [Defendant]."  (Rosenzweig Decl. ¶ 11; *compare* Jasne Aff'n Ex. B, *with* Rosenzweig Decl. Ex. C.)  As the president and CEO of Rosenzweig Insurance explained in a Declaration attached to Plaintiff's reply papers, his agency had emailed Defendant an invoice for the Additional Premium and Taxes and Fees on June 5, 2017.  (Rosenzweig Decl. ¶ 8.)[6] Similarly, the Alleged Invoice was another ledger report from Rosenzweig Insurance that it had provided to Defendant "on or about January 31, 2020."  (*Id.* ¶¶ 11, 13; *compare* Jasne Aff'n Ex. A, *with* Rosenzweig Decl. Ex. D.)[7]

Accordingly, in response to Plaintiff's Request for Admission pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendant admitted that, after conducting a "very diligent search" of its financial records, it was unable to locate any proof that it had paid the

---

[6] Although Mr. Rosenzweig's Declaration does not explicitly state that the Alleged Payment Record was the same document as the "invoice" sent to Defendant on June 5, 2017, that is the most natural reading of his Declaration and the attached exhibits.  (*See* Rosenzweig Decl. ¶ 8 ("On June 5, 2017, Rosenzweig Insurance emailed [Defendant] an invoice for the amount of [A]dditional Premium[] [and] [T]axes and [F]ees due under the Policy . . . ."); *id.* ¶ 11 ("Rosenzweig Insurance's internal records reflect that it invoiced [Defendant] for the $177,815.61 in [A]dditional [P]remium[] [and] [T]axes and [F]ees that [Defendant] owed [Plaintiff] on June 5, 2017.  Attached hereto as Exhibit C is a true and correct copy of a screenshot of Rosenzweig Insurance's ledger report for [Defendant].").)  As indicated *supra*, Exhibit C to the Rosenzweig Declaration is identical to the Alleged Payment Record.

[7] As Mr. Rosenzweig explained, the notations "co going direct for audit" and "company fees" indicate "that the file was returned to [Plaintiff] as uncollectable and, as a result, Rosenzweig Insurance was no longer (1) responsible for collecting the additional premium, taxes and fees that [Defendant] owed [Plaintiff] under the Policy, and (2) entitled to any commission." (Rosenzweig Decl. ¶ 12.)  Although Mr. Rosenzweig referred to the phrase "co going direct for audit," (*see id.*), the documents themselves contain the phrase "co **c**oing direct for audit," which appears to have been a typographical error, (*see* Jasne Aff'n Exs. A–B).

Additional Premium.  (Def.'s Resps. ¶¶ 1–2.)  Defendant also admitted that it had not created or maintained the ledgers in the Alleged Payment Record and Alleged Invoice, nor had it generated, maintained, or populated the data therein.  (*See id.* ¶¶ 4–7, 9–13.)  Finally, Defendant admitted that upon information and belief, and according to its "best recollection," it had received the ledgers in the Alleged Payment Record and Alleged Invoice from Rosenzweig Insurance.  (*Id.* ¶¶ 8, 14.)

Consistent with the information that came to light during the supplemental discovery period, the Parties submitted a stipulation which stated that, after "conduct[ing] a diligent search of its records for evidence of payment" of the Additional Premium and Taxes and Fees, Defendant had in fact "not located" any such evidence.  (Stipulation 2 (Dkt. No. 62).)  As part of this stipulation, Defendant therefore agreed to withdraw its defense that it had paid these amounts.  (*See id.*)  The Court endorsed the stipulation, (*see* Dkt. No. 63), and Plaintiff submitted its reply papers shortly thereafter.

B.  Procedural History

Plaintiff filed its Complaint on July 25, 2018.  (*See* Dkt. No. 1.)  Defendant answered on August 27, 2018.  (*See* Dkt. No. 9.)  Following an Initial Pretrial Conference on November 8, 2018, (Dkt. (minute entry for Nov. 8, 2018)), the Parties adopted a Case Management Plan and Scheduling Order, (Dkt. No. 15), which was subsequently amended on February 26, 2019, (*see* Dkt. No. 18), and again on June 5, 2019, (*see* Dkt. No. 27).  The case was referred to Magistrate Judge Paul E. Davison for general pretrial matters, including discovery.  (*See* Order (Dkt. No. 20).)

Pursuant to the Court's briefing schedule, Plaintiff filed the instant Motion and supporting papers on April 17, 2020.  (*See* Dkt. No. 52; *see also* Pl.'s Mem.; Pl.'s 56.1; First

Lahr Decl.)  In support of its Motion, Plaintiff submitted the Declaration of Sal. A. Pellitteri (the "Pellitteri Declaration"), who is "responsible for assisting in the collection of debts owed by [Plaintiff's] policyholders."  (Pellitteri Decl. ¶ 2.)  The Pellitteri Declaration attached several relevant documents, including (1) a copy of the Policy, (2) a copy of the audit report that was based on the May 16, 2017 audit (the "Audit Report"), and (3) a copy of a document Mr. Pellitteri referred to as "the audit endorsement" (the "Audit Endorsement").  (*See* Pellitteri Decl. Ex. A ("Arch Policy") (Dkt. No. 55-4); Pellitteri Decl. Ex. B ("Audit Report") (Dkt. No. 55-5); Pellitteri Decl. Ex. C ("Audit Endorsement") (Dkt. No. 55-6).)

After receiving an extension from the Court, (*see* Dkt. No. 58), Defendant filed opposition papers on June 18, 2020.  (*See* Jasne Aff'n; Def.'s Opp'n; Def.'s Counter 56.1.)  As discussed *supra*, on June 26, 2020, the Court adjourned Plaintiff's reply deadline by 30 days so the Parties could pursue additional discovery regarding certain documents Defendant had relied upon in its opposition papers.  (*See* Dkt. No. 61.)  On August 8, 2020, after the Parties had completed this additional discovery, the Court endorsed a stipulation withdrawing Defendant's argument that it had paid the Additional Premium and Taxes and Fees.  (*See* Dkt. No. 63.)  Plaintiff filed its reply papers on August 10, 2020.  (*See* Second Lahr Decl.; Def.'s Resps.; Rosenzweig Decl.; Pl.'s Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Pl.'s Reply") (Dkt. No. 65).)

On January 12, 2021, the Court directed Plaintiff to submit a supplemental affidavit explaining how the Additional Premium was calculated.  (Suppl. Aff. Order 5 (Dkt. No. 66).)  The Court explained that although it had "carefully examined the Policy, the Audit Report, and the Audit Endorsement in an effort to discern precisely how the Additional Premium was calculated[,]" it had found Plaintiff's documentation "inscrutable."  (*Id.* at 3.)  The Court advised

Plaintiff that its supplemental affidavit "should be clear, methodical, and painstaking in its explanation" of how both the Additional Premium and Taxes and Fees were calculated.  (*Id.* at 5.)  The Court also invited Defendant to submit a reply affidavit in response to Plaintiff's submission.  (*Id.*)  Accordingly, Plaintiff submitted the Declaration of David Guman on January 20, 2021 (the "Guman Declaration").  (*See* Decl. of David Guman in Further Supp. of Pl.'s Mot. for Summ. J. ("Guman Decl.") (Dkt. No. 67).)  Counsel for Defendant submitted a reply affirmation on January 27, 2021.  (*See* Aff'n of Hugh G. Jasne, Esq., in Further Opp'n to Summ. J. ("Jasne Reply Aff'n") (Dkt. No. 68).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"To survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward

with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

   B.   Analysis

   Although Plaintiff has asserted claims for (1) breach of contract, (2) unjust enrichment, and (3) account stated, (*see* Compl. ¶¶ 5–17, 18–21, 22–25), it has only moved for summary judgment on its breach of contract and account stated claims, (*see* Pl.'s Mem. 1).

      1.   Breach of Contract

   To prevail on its breach of contract claim, Plaintiff must establish four elements: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Wausau Bus. Ins. Co. v. Sentosa Care LLC*, 10 F. Supp. 3d 444, 457 (S.D.N.Y. 2014) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  Here, Defendant does not dispute the existence of an agreement, nor does it dispute that Plaintiff adequately performed its obligations under that agreement.  (*See* Def.'s Counter 56.1 ¶¶ 4–5.)  The first two elements are therefore satisfied.

   Although Defendant's production of alleged payment records appeared to present a genuine dispute regarding the third element, that dispute quickly vanished upon further scrutiny and Defendant's own subsequent admissions.  As noted, Defendant concedes that after conducting a "very diligent search" of its financial records, it has located no proof that it paid the Additional Premium.  (Def.'s Resps. ¶¶ 1–2.)  Defendant no longer contends that it paid the Additional Premium or Taxes and Fees and has withdrawn this defense from its Opposition papers.  (Stipulation 2.)  By contrast, the record contains multiple declarations from individuals with personal knowledge of this matter who state that Defendant failed to remit payment.  (*See* Pellitteri Decl. ¶¶ 4, 15–18; Rosenzweig Decl. ¶¶ 9–12.)  The record also contains

documentation showing multiple (futile) attempts to collect payment from Defendant.  (*See* June 2017 Invoice; Rosenzweig Decl. Ex. B; Second Lahr Decl. Ex. E (Dkt. No. 64-5).)  Thus, because there is no genuine dispute that Defendant has breached its agreement with Plaintiff under the Policy, Plaintiff has satisfied the third element of its breach of contract claim.

Finally, "[t]o collect damages for [Defendant's] failure to pay insurance premiums," Plaintiff "must offer evidence: '(1) showing that the policy was issued to the insured; and (2) illustrating the computation of the earned premium established through an audit of the insured's books and records after the expiration of the policy period.'"  *Wausau*, 10 F. Supp. 3d at 457 (quoting *Liberty Mut. Ins. Co. v. Thalle Constr. Co., Inc.*, 116 F. Supp. 2d 495, 500 (S.D.N.Y. 2000)).  There is no dispute Plaintiff issued an insurance policy to Defendant.  The only question left to resolve, then, is whether Plaintiff has adequately "illustrat[ed] the computation" of the Additional Premium and Taxes and Fees.  *See Wausau*, 10 F. Supp. 3d at 457.

As the Court previously explained, (*see* Suppl. Aff. Order 2), a party does not carry its burden on summary judgment "by simply dumping documents as exhibits to [its] motion[,]" *Travelers Ins. Co. v. Sequa Corp.*, No. 08-CV-10400, 2013 WL 12342419, at *5 (S.D.N.Y. Feb. 22, 2013) (denying motion for summary judgment where, in the absence of "some guidance from [the] [p]laintiffs, the task of . . . trying to piece together numbers that relate to the premium payment formula ha[d] proven to be insurmountable[,]" and noting that because the "[p]laintiffs ha[d] provided no help, they ha[d] not shown the proper calculations of the premiums established through an audit of the insured's records, [as would] entitle[e] them to judgment as a matter of law"), *vacated in part on other grounds on reconsideration*, 2014 WL 12812403 (S.D.N.Y. Mar. 10, 2014).  That is, even when a plaintiff provides documentation that purports to illustrate the computation of a premium amount, a court is under no obligation "to tick and tie the numbers

itself, . . . without even a jot of guidance from [the plaintiff]." *Fed. Ins. Co. v. Elf Aquitaine, Inc.*, 511 F. Supp. 2d 390, 396 (S.D.N.Y. 2007) (denying motion for summary judgment where the plaintiff had "made no attempt to explain how . . . 90 odd pages of insurance claims and retrospective computations [submitted in support of its summary judgment motion] [were] connected"). As noted, after trying (without success) to determine how Plaintiff calculated the Additional Premium based on the documents submitted in support of its Motion—namely, the Policy, Audit Report, and Audit Endorsement—the Court directed Plaintiff to submit a supplemental affidavit explaining precisely how the Additional Premium had been determined. (Suppl. Aff. Order 5.) To Plaintiff's credit, the document submitted in response to this Order (the Guman Declaration) has served as a useful guide in making sense of Plaintiff's methodology and calculations.

As explained in the Guman Declaration, the Arch Policy contains Defendant's initial, estimated exposure for different types of services (e.g., carpentry, masonry) to be performed in particular locations (either New York or Pennsylvania). (*See* Guman Decl. ¶ 7; Arch Policy 6.)[8] For example, Defendant's estimated exposure for carpentry services (Code No. 91342) to be performed in New York ("New York Carpentry") was $50,000, while its estimated exposure for masonry services (Code No. 97447) to be performed in New York ("New York Masonry") was $20,000. (*See* Arch Policy 6.)[9] Plaintiff charged different rates based on the type of service and

---

[8] Unless otherwise noted, page references to the Arch Policy, Audit Report, or Audit Endorsement refer to the ECF stamp on each page.

[9] Regrettably, Plaintiff uses the same numeric code to describe the same service in different locations. Thus, carpentry uses Code No. 91342, and masonry uses Code No. 97447, regardless whether these services were performed in New York or Pennsylvania. (*See* Arch Policy 6; Audit Report 3.) Different locations are instead indicated using a distinct "Loc[ation] No.," such as "1" (New York) or "2" (Pennsylvania). (*See* Arch Policy 6.) Although Plaintiff no doubt has some good reason for taking this approach, it presents difficulty when trying to

14

where the service was to be performed.  (*See* Guman Decl. ¶ 7.)  Even the same type of service in a particular location sometimes carried a different rate depending on whether the estimate was for "contracted operations" or "product-completed operations."  (*Id.*; Arch Policy 6.)  Thus, the Guman Declaration explains how Defendant's estimated exposure for each type of service in a particular location was sometimes multiplied by two rates—one for contracted operations, and another for product-completed operations—to derive the Initial Premium amount.  (*See* Guman Decl. ¶ 8; Arch Policy 6–7.)

The Guman Declaration also explains how the May 2017 audit produced the *actual* exposure figures set forth in the Audit Report.  (*See* Guman Decl. ¶ 16.)  The calculation of Defendant's actual exposure during the coverage period is significant for a simple reason.  As Plaintiff has emphasized at numerous points throughout this litigation, "[t]he audit could result in additional premium due to [Plaintiff] from [Defendant], or return of premium from [Plaintiff] to [Defendant].  (Pl.'s 56.1 ¶ 7; *see also* Guman Decl. ¶ 14 (same).)  As the Guman Declaration makes clear, this final accounting turned on whether—and to what extent—Defendant's actual exposure in a particular service category exceeded the estimated exposure for that same category.

The section labeled "Audit Summary" on page three of the Audit Report summarizes Defendant's actual exposure for each of the relevant categories.  (*See* Audit Report 3.)  As the Guman Declaration explains, these figures were based on Defendant's "payroll exposure" for each category during the Policy's coverage period.  (Guman Decl. ¶ 16.)  To take one example, the actual exposure for New York Carpentry was $377,252.  (*See* Audit Report 3.)  Page six of

---

provide a clear description of a calculation that cascades over multiple documents.  The Court therefore will provide a distinct designation for the most relevant categories, as it has done *supra*.

the Audit Report indicates that this figure is the sum of two amounts—$83,072 in "Gross Payroll" and $294,180 in "Contract Labor" for this category.  (*See id.* at 6.)  To verify the first amount, the Court identified every employee with the corresponding numeric code in the table labeled "Gross Payroll – NY Detail" on pages three and four of the Audit Report.  (*See id.* at 3–4.)  Adding the payment amounts for these employees produces a total of $83,072.  (*See id.*)  To verify the $294,180 "Contract Labor" figure, the Court identified every employee with the corresponding numeric code in the table labeled "Gross Payroll – NY Figures" on pages four and five of the Audit Report.  (*See id.* at 4–5.)  Adding the payment amounts in the "Contract Labor" column for these employees produces a total of $294,180.  (*See id.*)  Although the Guman Declaration did not explain the breakdown of the $377,252 figure in such detail, the Court is confident this figure is accurate based on its own examination of the Audit Report and the cross-checking analysis described above.

Thus, Defendant's actual exposure for New York Carpentry ($377,252) exceeded its estimated exposure ($50,000) by a considerable amount.  (*See* Audit Report 9.)  New York Masonry was another category in which Defendant's actual exposure ($37,128) exceeded its estimated exposure ($20,000).  (*See id.*)  As the Audit Report indicates, however, Defendant had no actual exposure for the remaining service categories set forth in the Policy—subcontracting in New York, subcontracting in Pennsylvania, carpentry in Pennsylvania, and masonry in Pennsylvania.  (*See* Audit Report 3; Arch Policy 6.)  According to the Guman Declaration, that is because Defendant "ultimately did not hire any subcontractors to perform work [in New York]," just as he "did not perform any work or hire [any] subcontractors in Pennsylvania."  (Guman Decl. ¶ 17.)

16

But while the Guman Declaration methodically accounts for each of the six service categories identified above, each of which appeared in the Policy itself, the Declaration is curiously silent regarding a seventh category that appeared for the first time in the Audit Report. According to the comments section in the Audit Report, an additional category (Code No. 91580) was "recommended and added" to account for Defendant's "principal," Mr. Quni, "who holds 100% stock ownership in the corporation" and is responsible for "manag[ing] the finances, procur[ing] jobs, review[ing] financial reports[,] and supervis[ing] the employees." (Audit Report 2; *see id.* at 10 (noting that "[c]lass code 91580 is recommended and added for the principal as he supervises the employees on the job sites").) Mr. Quni, the Audit Report also notes, "[did] not perform any carpentry or masonry work." (*Id.* at 2; *see id.* at 10 (noting that Mr. Quni "does not do any actual carpentry and masonry work").) The Audit Report concluded that Defendant's actual exposure for this newly created category—which the Court will refer to as "Executive Supervision," (*see id.* at 3)—was $27,500, (*id.*). The Audit Report included this amount as a separate line item in its "Audit Summary" section. (*See id.*) Thus, according to the Audit Report, Defendant's total actual exposure included $377,252 for New York Carpentry, $37,128 for New York Masonry, and $27,500 for Executive Supervision. (*See id.*)

As the Guman Declaration explains, the Audit Endorsement takes the actual exposure figures from the Audit Report and compares them to the estimated exposure figures from the Arch Policy. (*See* Guman Decl. ¶ 19.) For example, the Audit Endorsement shows that for the New York Masonry category, Defendant had an estimated exposure of $20,000 and an actual exposure of $37,128. (*See* Audit Endorsement 6–7.)[10] To derive the Additional Premium,

_____

[10] The Audit Endorsement uses the term "Policy Exposure" to refer to estimated exposure and the term "Audit Exposure" to refer to actual exposure. (*See* Audit Endorsement 6.)

Plaintiff subtracted the estimated exposure from the actual exposure and then multiplied the difference by the corresponding rates for that category as set forth in the Arch Policy.  (*See* Guman Decl. ¶ 20.)  As noted *supra* with respect to the Initial Premium, some service categories had two rates—one for contracted operations (listed as the "Prem/Ops" rate in the Arch Policy), and another for product-completed operations (listed as the "Prod/Comp Ops" rate in the Arch Policy).  (*See Id.* ¶¶ 7–8; Arch Policy 6.)  For service categories where this was the case, the Audit Endorsement took the difference between actual and estimated exposure and multiplied this figure by each of the two rates.  Thus, with respect to the New York Masonry category, Plaintiff subtracted $20,000 from $37,128 and then multiplied the difference ($17,128) by the "Prem/Ops" rate of .566487 set forth in the Arch Policy, yielding an Additional Premium of roughly $9,703.  (*See* Arch Policy 6; Audit Endorsement 6.)[11]  Plaintiff replicated this calculation using the "Prod/Comp Ops" rate.  (*See* Audit Endorsement 7.)[12]  For service

---

[11] One peculiarity of Plaintiff's math is that, while both the Arch Policy and Audit Endorsement list the various rates as whole numbers in U.S. dollars, the relevant calculation treats these figures as percentages.  For example, the "Prem/Ops" rate for New York Masonry is listed as $566.487.  (*See* Arch Policy 6; Audit Endorsement 6.)  But to calculate the Additional Premium (and, for that matter, the Initial Premium), Plaintiff uses the figure .566487, thus treating the rate as if it were a percentage (56.6487%).  (*See* Arch Policy 6; Audit Endorsement 6; Guman Decl. ¶ 20.)  This may well be an insurance-industry convention, but the Court notes it here for the benefit of lay readers.

[12] Returning to the peculiarity identified *supra* n.11, the Court further notes that Plaintiff's standard methodology seems to entail dividing any given rate by 1,000, or, stated differently, Plaintiff moves the decimal point three places to the left.  Thus, $566.487 becomes .566487, but $30.911 becomes .030911.  (*See* Arch Policy 6 (multiplying Defendant's estimated audit exposure of $20,000 by .03911 to yield an Initial Premium of $618); Audit Endorsement 7 (multiplying the difference between actual and estimated exposure ($17,128) by .030911 to yield an Additional Premium of roughly $530); Guman Decl. ¶ 20 (illustrating the Additional Premium calculation).)  Likewise, whereas the New York Carpentry "Prem/Ops" rate of $430.754 becomes .430754, the New York Carpentry "Prod/Comp Ops" rate of $48.566 becomes .048566.  (*See* Audit Endorsement 6 (showing Additional Premium amounts that reflect this conversion); Guman Decl. ¶ 20 (also illustrating this conversion).)

categories where Defendant incurred no actual exposure during the coverage period, Defendant simply "received a full credit for the amount of initial deposit premium [it had] paid based on [its] estimated . . . exposure." (Guman Decl. ¶ 21.)  Thus, the Audit Endorsement lists these categories and indicates a refund of premium in the same amount as Defendant's Initial Premium payments for these same categories.  (*See* Audit Endorsement 7–9.)  To determine the *total* Additional Premium, Plaintiff took the total Additional Premium amounts for categories in which actual exposure exceeded estimated exposure ($180,273), and then subtracted the premium amounts to be refunded to Defendant based on categories where there had been no actual exposure (-$8,934), yielding a final amount of $171,339.  (*See* Guman Decl. ¶ 22.)

For the most part, the Court has been able to trace the flow of information among Plaintiff's documents, reconstruct its methodology for determining the Additional Premium amount, and verify the accuracy of its calculations.  But there is one notable discrepancy. Although the "Audit Summary" section of the Audit Report indicates that Defendant's actual exposure for New York Carpentry was $377,252—a figure the Court verified by painstakingly adding each relevant employee's gross payments—the Audit Endorsement curiously lists the actual exposure for this category as $404,752.  (*Compare* Audit Report 3, *with* Audit Endorsement 6.)  Also puzzling is the fact that the "Executive Supervision" category, which was added during the Audit Report with an actual exposure of $27,500, is nowhere to be found in the Audit Endorsement.  (*Compare* Audit Report 3, *with* Audit Endorsement 6–9.)  These discrepancies, of course, are no mystery.  Plaintiff has simply taken the $27,500 actual exposure for the Executive Supervision category and lumped it in with the $377,252 actual exposure for New York Carpentry.  The Audit Endorsement then passes off the combined total—$404,752— as if it were the total amount for New York Carpentry alone.  (*See* Audit Endorsement 6.)  This

questionable expedient presents two problems.  First, it is arbitrary.  There is no obvious reason why the "Executive Supervision" category should be lumped in with New York Carpentry as opposed to, say, New York Masonry.  Indeed, the Audit Report suggests neither such category is appropriate, for Mr. Quni "does not perform *any carpentry or masonry work*."  (Audit Report 2 (emphasis added); *id.* at 10 (same).)  The second problem is that Plaintiff's accounting maneuver runs afoul of basic contract law.  To calculate the Additional Premium, Plaintiff has applied the coverage rates specified for New York Carpentry to $27,500 of actual exposure that belongs to an entirely different category—a category for which no rates were ever negotiated by the Parties. As the Audit Report notes, the Executive Supervision category was added at the time of audit. (*See id.*)  The Arch Policy itself contains no mention of this category, let alone any coverage rates that would apply to it.  In short, the Executive Supervision category was never part of the negotiated bargain, and Plaintiff may not unilaterally decide how to charge for this putative exposure at some later time without properly modifying the contract to supply such terms.  *See Dev. Specialists, Inc. v. Peabody Energy Corp. (In re Coudert Brothers)*, 487 B.R. 375, 393–94 (S.D.N.Y. 2013) ("Under New York law, it is fundamental to the establishment of a contract modification that proof of each element requisite to the formulation of a contract be shown.  This includes mutual assent to the contract's terms."  (alterations and internal quotation marks omitted) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003))).

The Guman Declaration, although thorough in almost every other regard, does nothing to shed light on the discrepancy noted above.  For example, while it clearly explains that the "Audit Exposure" column in the Audit Endorsement reflects the "actual payroll exposure" as determined in the Audit Report, (*see* Guman Decl. ¶ 20 & n.5), it studiously avoids explaining how the actual exposure for New York Carpentry went from $377,252 in the Audit Report to $404,752 in

the Audit Endorsement.  It is also puzzling, as noted, that the Guman Declaration's detailed discussion of the Audit Report accounts for each of the service categories that were part of the Arch Policy, but then omits any reference to the newly added Executive Supervision category. (*See id.* ¶¶ 13–18.)

In sum, Plaintiff has not established that there is no genuine dispute of material fact regarding the amount of damages to which it is entitled.  At the same time, however, it is clear that Plaintiff is entitled to *some* amount of damages.  For example, if the Court were entirely to omit the $27,500 in actual exposure for the Executive Supervision category, Defendant would still owe $158,157 in Additional Premium.[13]  Based on this amount, Defendant would also owe $5,978 in Taxes and Fees.[14,15]

Accordingly, the Court will partially grant and partially deny summary judgment on Plaintiff's breach of contract claim.  Summary judgment is granted with respect to all aspects of this claim except the following issues: (1) whether Defendant is liable for the actual exposure identified under the Executive Supervision category in the Audit Report; (2) if Defendant is liable for this actual exposure, what rate is to be applied to this exposure for purposes of

---

[13] This figure is derived by replacing the $404,752 figure in the Audit Endorsement with the actual exposure for New York Carpentry as provided in the Audit Report ($377,252), and then re-calculating the Additional Premium as described in the Guman Declaration.  (*See* Guman Decl. ¶¶ 19–22.)

[14] This figure is derived by applying the multipliers in ¶ 24 of the Guman Declaration to the re-calculated Additional Premium figure of $158,157.

[15] Indeed, the Court is prepared to amend this Order and enter summary judgment for Plaintiff in the total amount of $164,135 ($158,157 + $5,978).  Plaintiff should notify the Court within one week of the entry of this Order whether it is willing to accept this determination or would rather proceed with litigation regarding the additional $27,500 in putative exposure.

calculating the Additional Premium; and (3) in light of issues (1) and (2), the total amount of

damages to which Plaintiff is entitled.

### 2.  Account Stated

"Under New York law, an 'account stated' refers to a promise by a debtor to pay a stated

sum of money which the parties had agreed upon as the amount due."  *Air Atlanta Aero Eng'g*

*Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 197 (S.D.N.Y. 2009).  To establish its

claim for account stated, Plaintiff must show that: "(1) an account was presented; (2) it was

accepted as correct; and (3) [Defendant] promised to pay the amount stated."  *Cvar Von*

*Habsburg Grp., LLC v. Decurion Corp.*, No. 18-CV-11218, 2020 WL 4577440, at *3 (S.D.N.Y.

Mar. 26, 2020) (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395,

411 (S.D.N.Y. 2009)).

It is well-established, however, that an account stated claim may not "be utilized simply

as another means to attempt to collect under a disputed contract."  *4Kids Ent., Inc. v. Upper Deck*

*Co.*, 797 F. Supp. 2d 236, 249 (S.D.N.Y. 2011) (quoting *Martin H. Bauman Assocs., Inc. v. H &*

*M Int'l Transp., Inc.*, 171 A.D.2d 479, 485 (1st Dep't 1991)).  "[A]s a matter of law, [a]

[d]efendant cannot be found liable on both an account stated claim . . . and a breach of contract

claim . . . in connection with the same allegations of a failure to pay monies owed."  *Wachtel &*

*Masyr LLP v. Brand Progression LLC*, No. 11-CV-7398, 2012 WL 523621, at *1 (S.D.N.Y. Feb.

15, 2012); *see also Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-CV-2949, 2017 WL

818364, at *7 (E.D.N.Y. Mar. 1, 2017) (stating same proposition).  Thus, in *4Kids*

*Entertainment, Inc. v. Upper Deck Co.*, the court dismissed the plaintiff's account stated claim,

which it found was "congruent with, and duplicative of, its claim for breach of contract[.]"  797

F. Supp. 2d at 249; *see also Fort Prods., Inc. v. Men's Med. Clinic, LLC*, No. 15-CV-376, 2016

WL 797577, at *4 (S.D.N.Y. Feb. 23, 2016) (dismissing plaintiff's account stated claim where the amended complaint "allege[d] nearly identical facts for both the breach of contract claim and the account stated claim[,]" and where "the damages stated for both claims [were] identical"). Similarly, in *Cobblestone Advisory Group, LLC v. Lembi Group Partners, LLC*, No. 10-CV-4761, 2011 WL 5881187 (S.D.N.Y. Nov. 22, 2011), the court granted summary judgment on the plaintiff's breach of contract claim but then denied summary judgment on its account stated claim, observing that "[b]ecause [the plaintiff] [sought] to enforce [the defendant's] obligations under the[ir] [contract], it cannot properly maintain an action for an account stated[,]" *id.* at *6.

Here, as in the cases above, Plaintiff's account stated claim is "congruent with, and duplicative of, its claim for breach of contract." *See 4Kids Ent.*, 797 F. Supp. 2d at 249.  As the Second Circuit has explained, "[t]wo claims are duplicative of one another if they arise from the same facts and do not allege distinct damages." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (citation, ellipsis, and internal quotation marks omitted).  That is the case here.  Plaintiff's account stated claim stems from identical facts as its breach of contract claim and seeks identical damages.  (*Compare* Compl. ¶ 17, *with id.* ¶ 25.)  Here, as in *Fort Productions*, Plaintiff's "account stated claim expressly incorporates the allegations set forth in the section detailing the breach of contract cause of action[,]" further indicating that the claims are duplicative of one another.  *See Fort Prods.*, 2016 WL 797577, at *4.  (*See* Compl. ¶ 22.)  Plaintiff may not use an account stated claim "simply as another means to attempt to collect under" the Policy.  *See 4Kids Ent.*, 797 F. Supp. 2d at 249.  Because the Court has found Defendant liable under Plaintiff's breach of contract claim, it may not be found liable on Plaintiff's account stated claim "as a matter of law," *Wachtel & Masyr*, 2012 WL 523621, at *1. The Court therefore denies summary judgment with respect to Plaintiff's account stated claim.

III.  Conclusion

For the reasons stated above, Plaintiff's Motion is granted in part and denied in part.  The

Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 52).

SO ORDERED.

Dated:      March 31, 2021
            White Plains, New York

_____
            KENNETH M. KARAS
            United States District Judge